UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:17-CV-00205-GNS-CHL

MELISSA GIPSON                                                                         PLAINTIFF

v.

PROGRESSIVE CASUALTY
INSURANCE COMPANY                                                                      DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (DN 24). The motion is now ripe for a decision. For the reasons outlined below, the motion is **GRANTED**.

### I.   STATEMENT OF FACTS AND CLAIMS

This is a bad faith action brought under the Kentucky Unfair Claims Settlement Practices Act ("KUCSPA"), KRS 304.12-230, by Melissa Gipson ("Gipson") against Progressive Casualty Insurance Company ("Progressive") for its handling of her third-party liability claim. On February 16, 2012, Gipson was rear-ended by Progressive's insured motorist, Bradley Johnston ("Johnston"), while stopping at a traffic light in Louisville, Kentucky. (Pl.'s Resp. Def.'s Mot. Summ. J. 3, DN 39 [hereinafter Pl.'s Resp.]). The Hertz rental vehicle operated by Gipson at the time of the collision was totaled, and in the days following the accident Gipson began experiencing pain in her neck, lower back, and right hip. (Pl.'s Resp. 3).

Gipson sought medical treatment on February 20, 2012, at Norton Audubon Hospital in Louisville, where she was diagnosed with neck and lumbar strains. (Pl.'s Resp. 3). Two days later, Gipson saw her primary care physician, Angela Crone, M.D. ("Dr. Crone"), who treated her

1

symptoms and ordered a series of MRIs. (Pl.'s Resp. 3). On February 23, Gipson first discussed her claim with Progressive adjustor Laura Setters ("Setters") and informed Setters of the upcoming MRIs. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. G, at 6, DN 39-7 [hereinafter Claim Notes]).[1] Setters' notes reflect that Progressive had determined Johnston was 100% at fault for the collision. (Claim Notes 6).

On February 28, 2012, Gipson went to Floyd Memorial Hospital for an MRI of her cervical and lumbar spine, which showed degenerative disk disease with a minor bulge at C5-6 and mild bilateral neural foraminal narrowing in her low back. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. E, DN 39-5). On March 2, Setters spoke with Gipson regarding her MRIs and doctor's visit, noting that Gipson said her "C-5-6 is now 'blown out.'" (Claim Notes 6). Gipson also related to Setters that she had undergone surgery on her back twelve years earlier. (Claim Notes 7).

On March 9, 2012, another Progressive claims adjuster, Stephen Dant ("Dant"), received Gipson's claim file after it was transferred to Progressive's Large Loss Lite division and assigned a $50,000 reserve. (Claim Notes 8). Gipson was asked to follow up with Hertz regarding personal injury protection ("PIP") coverage[2] on March 12, and Gipson told Dant she was experiencing some

---

[1] The bulk of the chronology in this case from both parties comes from Progressive's claims file. Because Gipson does not contest the content of these notes and in the absence of citation to contradictory evidence in the record, the accuracy of these notes will be accepted.

[2] "Basic reparations benefits" (also commonly referred to as "PIP" benefits") are mandated by the Kentucky Motor Vehicle Reparations Act ("KMVRA"), "the intent [of which] was to provide a remedy to automobile accident victims that could not be impinged upon by any means whatsoever." *Blue Cross & Blue Shield of Ky., Inc. v. Baxter*, 713 S.W.2d 478, 480 (Ky. App. 1986) (citations omitted); *see also Stevenson ex rel. Stevenson v. Anthem Cas. Ins. Grp.*, 15 S.W.3d 720, 723 (Ky. 1999) ("Although the correct terminology is . . . 'basic reparation benefits,' that terminology has been used interchangeably with 'personal injury protection' (PIP) benefits when describing what are generically known as 'no fault' benefits under Kentucky law."). "If the vehicle which the injured person was driving or in which he was a passenger is covered by a no-fault policy, the insurer of the vehicle is responsible for [PIP] payments." Robert D. Monfort, *Kentucky Handbook Series, Kentucky Motor Vehicle Insurance Law with Forms* § 11:7 (2018-2019 ed.). The maximum amount of PIP benefits is $10,000 per person. *See* KRS 304.39-020(2).

radicular pain down her left arm down to her thumb. (Claim Notes 9). That day Dant printed a medical authorization form which he sent to Gipson to allow Progressive to obtain copies of her medical records. (Def.'s Mot. Summ. J. Ex. 2, DN 24-3; Claim Notes 9). Dant noted he would follow up with Gipson in thirty days. (Claim Notes 9).

Dant spoke with Gipson again on April 5, 2012, and informed her he still had not received the medical authorization. (Claim Notes 10). He advised Gipson to speak with a supervisor at Hertz concerning PIP coverage, and Gipson agreed to contact Dant again if she did not receive the medical authorization form in the mail. (Claim Notes 10). On July 5, 2012, Dant received cervical and lumbar MRI reports from Gipson showing spinal fusions from prior surgeries and "small paracentral herniations with minor stenosis and bilateral foraminal impingement." (Claim Notes 11).

Sometime in the summer of 2012, Gipson moved to Florida and saw Julie Suddoth, M.D. ("Dr. Suddoth"). (Pl.'s Resp. 3). Dr. Suddoth issued Gipson prescriptions on July 11 and October 27, 2012, for pain management. (Pl.'s Resp. 3). Dant did not learn of Gipson's move until he spoke with her on July 24, 2012. (Claim Notes 11). His notes from this conversation indicate that Gipson said she never received the medical authorization form, that she was considering seeking additional treatment, and that she would follow up in thirty days. (Claim Notes 11-12).

On September 17, 2012, having received Gipson's medical authorization, Dant submitted a request for records from prior treatment Gipson had undergone, and faxed the authorization to Dr. Crone requesting Gipson's medical records and bills. (Claim Notes 12). On October 16, Dant received a voicemail from Dr. Crone's office advising that Gipson's records had been sent to Gipson's doctor in Florida and that he would need to order her records from them. (Claim Notes 12). That same day, Dant spoke with Gipson and told her that he needed the documents from her

3

physician and potentially a second opinion depending upon what those records showed. (Claim Notes 12).

After a missed call in November, Dant next spoke with Gipson on December 5, 2012, when Gipson indicated she was ready to settle her claim. (Claim Notes 13). Dant informed Gipson that the medical authorization she provided limited the release of medical records to treatment rendered *only after* the collision. (Claim Notes 13). Dant told Gipson he wanted her earlier records to evaluate her claim, and she agreed to complete and return another form authorizing the release of those records. (Claim Notes 13). Gipson advised Dant at that time that she was considering a lost wage claim, for which Dant said he would need supporting documentation. (Claim Notes 13). On January 8, 2013, Dant spoke with Gipson and again advised her that he needed supporting documentation for her lost wage claim. (Claim Notes 13). Gipson repeated she was ready to settle, but Dant advised her a settlement would be based solely on the medical records he had received and that nothing could be paid for unsupported lost wage claims. (Claim Notes 13). Gipson agreed to attempt to document her lost wages and to get back in contact with Dant. (Claim Notes 13).

On January 22, 2013, Dant received a letter of representation from Gipson's attorney, Zachary Taylor ("Taylor"). (Claim Notes 13). Later that day, Dant informed Taylor by phone that Gipson seemed to have completed treatment, appeared ready to settle, and was gathering documentation for a lost wage claim. Taylor told Dant that he would submit a settlement demand to Progressive on behalf of Gipson. (Claim Notes 14). Dant attempted to contact Taylor twice monthly for the next nine months seeking Gipson's demand before he finally connected. When he spoke to Taylor on October 17, 2013, Dant noted that Taylor seemed unfamiliar with Gipson's claim but said he was gathering supporting documents to present a demand package to Progressive. (Claim Notes 16).

4

In the meantime, Gipson had begun seeing orthopedic specialist Jeffrey Fadel, M.D. ("Dr. Fadel") in March 2013. (Pl.'s Resp. 4). Dr. Fadel diagnosed Gipson with post-traumatic sacroiliitis of the right pelvis which he attributed to the February 2012 collision. (Pl.'s Resp. 4). Dr. Fadel recommended sacroiliac joint injections, trigger point injections, physical therapy, and continued pain management. (Pl.'s Resp. 4). Jeffrey Campbell, M.D., administered the sacroiliac joint injections on April 3, 2013, which provided some pain relief to Gipson. (Pl.'s Resp. 4; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. D, at 2-3, DN 39-4).

On July 31, 2013, Gipson was seen by Casey O'Donnell, D.O. ("Dr. O'Donnell"), who specializes in rehabilitation and pain management. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. F, DN 39-6). Dr. O'Donnell diagnosed Gipson with right lumbar facet syndrome, lumbosacral spondylosis and low back pain. (Pl.'s Resp. 4-5). Dr. O'Donnell prescribed sacroiliac joint injections to the right lumbar facet joints, which were completed on February 25, 2014, and were noted to have resulted in a significant recovery. This was the last medical treatment Gipson received for her low back. (Pl.'s Resp. Def.'s Mot. Summ. J. at 5, Ex. F)

Almost fourteen months after Dant initially spoke with Taylor, the first settlement demand on behalf of Gipson was sent to Progressive on March 12, 2014. (Claim Notes 17). The demand offered to settle Gipson's claim for $201,368, consisting of $19,092 for medical treatment, $57,276 for pain and suffering, $100,000 for disfigurement or impairment, and $25,000 for future medical expenses. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. D, DN 39-5). Dant reached Taylor two weeks later and offered to settle Gipson's claim for $5,000. (Claim Notes 19). Dant's notes reflect that the offer was low due to a gap in Gipson's treatment[3] and her preexisting spinal fusion. (Claim

---

[3] This noted gap was from the date of Gipson's MRI on February 28, 2012, to October 31, 2012, when Gipson saw Dr. Suddoth reporting a five-day history of back pain, without mention of any

5

Notes 19). Taylor responded to Dant's offer with a demand of $150,000, to which Dant counteroffered $7,000. (Claim Notes 19). Dant was perplexed as to why Taylor believed Gipson's claim was worth so much because, even if he accepted all her medical expenses as related to the accident (which he did not), the injury consisted of a lumbar strain with only conservative treatment. (Claim Notes 19). Taylor responded on April 30, 2014, with a settlement demand of $120,000, and Dant replied with an $8,500 counteroffer the same day. (Claim Notes 19).

Between April 30, 2014 and September 4, 2014, Dant made eleven unanswered phone calls to Taylor and sent numerous letters requesting a response to the last settlement offer. (Claim Notes 19-21). When he finally reached Taylor on September 4, 2014, Taylor told Dant that a lawsuit had been filed in state court against Progressive's insured, Johnston, on June 17, 2014, a copy of which Taylor sent to Dant. (Claim Notes 21). Also that day, Gipson's claim file was transferred to Adam Luhrs ("Luhrs"), who handled Progressive's litigation claims. (Claim Notes 21). Luhrs promptly notified Taylor of the change in adjustors. (Claim Notes 21).

Luhrs assessed Gipson's claim and the related litigation. He noted that there was no injury claimed at the time of the 2012 collision, almost half of the medical expenses had been incurred after a several-months-long gap in treatment, and there was still no documentation for lost wages. (Claim Notes 21-23). At that time, Progressive's offer remained at $8,500 and Gipson's demand stood at $120,000. (Claim Notes 24).

During the discovery phase of the state litigation, Luhrs learned that Gipson had filed for disability benefits after the February 2012 accident, but claimed the disability onset date was in September 2011. The disability claim was denied. (Claim Notes 33). He noted that Gipson "made

---

vehicle accident. Gipson's earlier visit with Dr. Suddoth on July 11, 2012, had been solely for adrenal insufficiency and hyperlipidemia. (Claim Notes 17-18).

6

a good witness[,]" had received epidural injections, and that there would be no documentation for lost wages. (Claim Notes 29).

On November 4, 2015, Luhrs commented in his notes: "we haven't learned anything in litigation that has substantially changed our view" regarding Progressive's evaluation of Gipson's claim. (Claim Notes 34). On the same day, Taylor submitted a settlement demand of $100,000—the first demand within the limits of Progressive's insurance policy. (Claim Notes 34). Luhrs submitted a counteroffer to settle for $9,000 that same day. (Claim Notes 34-35).

On March 29, 2016, it was noted that Dr. O'Donnell's deposition testimony linked Gipson's back problems to the 2012 collision, despite the fact that Dr. O'Donnell was unaware of Gipson's history of prior back surgery. (Claim Notes 40). The next day, Progressive Supervisor Paul Westerbrook directed that an offer of judgment be filed to settle Gipson's case for $20,000, based upon Dr. O'Donnell's testimony and anticipated litigation expenses if the case were to proceed to trial. (Claim Notes 40). On April 28, Gipson accepted the $20,000 offer, which was finalized on May 26, 2016.

On March 3, 2017, Gipson filed the present action in state court, claiming that Progressive breached its duty of good faith and fair dealing in violation of the KUCSPA in its handling of Gipson's claim. (Compl., DN 1-1). Progressive removed the case to this Court and subsequently moved for summary judgment. (Notice Removal, DN 1; Def.'s Mot. Summ. J. DN 24).

## II.     **JURISDICTION**

This Court has subject-matter jurisdiction of this matter based upon diversity jurisdiction. *See* 28 U.S.C. § 1332.

### III. STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific proof demonstrating the existence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While courts must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

In Kentucky, insurers are prohibited from engaging in fourteen specified unfair claims settlement practices set forth in the KUCSPA. *See* KRS 304.12-230. Gipson claims here that Progressive violated four subsections of KUCSPA in handling her bodily injury claim by: (i) "[f]ailing to adopt and implement reasonable standards for the prompt investigation of claims

8

arising under insurance policies"; (ii) "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information"; (iii) "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear"; and (iv) "[c]ompelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds . . . ." KRS 304.12-230(3)-(4), (6)-(7); (Pl.'s Resp. 10-11).

The statute "is intended 'to protect the public from unfair trade practices and fraud' and 'imposes what is generally known as the duty of good faith and fair dealing owed by an insurer to an insured.'" *Phelps v. State Farm Mut. Auto Ins. Co.*, 736 F.3d 697, 703 (6th Cir. 2012) (quoting *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 515 (Ky. 2006)). An insurer's violation of the KUCSPA creates a private cause of action not only for the insured, but also for those with claims against insured parties (known as "third-party claims"), and the same standards govern both types of cases. *See Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 452 (Ky. 1997). It follows that the KUCSPA prohibitions apply to insurer conduct both before and after the commencement of tort litigation. *See Knotts*, 197 S.W.3d at 517.

In *Hollaway v. Direct General Insurance Co. of Mississippi, Inc.*, 497 S.W.3d 733 (Ky. 2016), the Kentucky Supreme Court addressed the requirements of proving a bad faith claim under the KUCSPA:

> Despite the relatively straightforward directives in the KUCSPA regarding insurers' behavior in the course of investigating and settling claims, Kentucky law still imposes a tall burden of proof on plaintiffs seeking to recover on a theory of bad faith. To succeed on her third-party suit, our decision in *Wittmer v. Jones* requires Hollaway to show that: (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; *and* (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." Proof of this third element requires evidence that

9

the insurer's conduct was outrageous, or because of [its] reckless indifference to the rights of others.

Use of the conjunctive "and" in our *Wittmer* test is quite revealing—it combines the individual items of *Wittmer*, creating a prerequisite that all elements of the test must be established to prevail on a third-party claim for bad faith under the KUCSPA.

*Id.* at 737-38 (emphasis omitted) (internal citations omitted). A plaintiff who fails to present evidence supporting any one of these elements has no bad faith claim as a matter of law. *See id.* at 739. Although the KUCSPA "should be liberally construed as to effectuate its purpose," Kentucky courts have noted that the "threshold standard for stating such a claim is 'high indeed.'"[4] *Phelps*, 736 F.3d at 703 (citation omitted); *Shaheen v. Progressive Cas. Ins. Co.*, 673 F. App'x 481, 484 (6th Cir. 2016) (citation omitted).

In this case, there is no question that the first *Wittmer* factor is present: the accident involved a rear-end collision and Progressive conceded Johnston's fault at the outset. Although Progressive did not question its responsibility to pay Gipson for her legal damages arising from the collision, the point of contention from the inception of the claim through the time of settlement was *how much did it owe*. *See Hollaway*, 497 S.W.3d at 739. Progressive's acknowledgement that its insured driver caused the accident does not equate to acceptance of responsibility for any amount of damages Gipson claimed. *See id*.

---

[4] A predicate to bringing a bad faith claim is that the plaintiff must suffer an injury as a result of the insurer's misconduct instead of merely alleging a technical violation of the KUCSPA. *See Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 533 (6th Cir. 2006) (citation omitted). Gipson satisfies this initial showing. In her Amended Complaint, Gipson alleges she "has suffered actual damages in the form of interest and other pecuniary loss, inconvenience, emotional and mental distress, anxiety, stress, turmoil, and embarrassment." (Am. Compl. ¶ 18, DN 18). This claim is supported by Gipson's testimony that her "medical bills still to this day are not paid[,]" that her credit has been ruined as a result, and that she has incurred associated legal costs. (Gipson Dep. 46:15-19, Oct. 9, 2017, DN 25-1).

10

With respect to the second and third *Wittmer* prongs, Gipson has not pointed to proof in the record establishing that Progressive lacked a reasonable basis to question the amount of her claim, that Progressive knew it had no reasonable basis to question Gipson's damages, or that Progressive acted recklessly in denying her claim. Moreover, there is absolutely no evidence of any outrageous conduct by Progressive in settling the claim, which finally amounted to a small fraction of Progressive's policy limits and a far smaller fraction of Gipson's initial demand of over $200,000.

Gipson first criticizes Progressive for not obtaining medical records related to her prior injury. (Pl.'s Resp. 12). Although Gipson correctly notes that Progressive questioned on November 17, 2012, whether it had sufficient medical records to evaluate the claim fully, the adjuster later determined that it did not have all of the records because Gipson had limited her authorization to only records from the date of the accident forward. (*Compare* Claim Notes 12, *with* Claim Notes 13; Def.'s Mot. Summ. J. Ex. 3, DN 24-4). Progressive requested the medical authorization within a month of the accident, but did not receive the executed authorization from Gipson until September 14, 2012, and even then Progressive's access was limited by Gipson to post-accident records. (Claim Notes 9, 12). Gipson cannot be heard to accuse Progressive of bad faith for failing to get records which she prevented the adjuster from obtaining.

Gipson next complains that, after a settlement had been reached in April 2016, one of Progressive's adjusters questioned whether the prior records had been obtained. (Pl.'s Resp. 12; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. O, DN 39-15). Given that there was never a dispute that Gipson had a surgical fusion from her previous accident, these records would not appear to be of great significance. Further, the adjuster's question "[d]id we obtain prior records?" is a far cry from providing evidence that the records were never obtained. One obvious explanation why a

hard copy of the records may not have been in an adjuster's file would be that the records were gathered by Progressive's litigation counsel. Giving Gipson the benefit of the doubt on this point and assuming neither Progressive nor its attorneys got the old records, evidence of inadvertence, sloppiness, tardiness, or mere negligence are insufficient to create a triable issue for submission to a jury. *See Phelps*, 736 F.3d at 709.

Gipson next argues that Progressive had no basis to question whether Dr. O'Donnell's treatment, which ultimately resolved Gipson's back pain, was related to the subject accident. (Pl.'s. Resp. 13). As set forth above, however, Progressive's adjuster noticed a significant gap between Gipson's MRI shortly after the accident and her next treatment with Dr. Suddoth in late October 2012, at which time Gipson gave a history of back problems for only five days and did not even mention the February 2012 collision. It was further noted that Gipson's only prior visit to Dr. Suddoth in July 2012 was for problems wholly unrelated to any injury. Given that Gipson had a prior injury and cervical fusion and a significant gap in treatment for her back from shortly after the accident until late October 2012, questioning whether the subsequent medical care was related to the February 2012 accident (versus the previous fusion on some intervening incident) was not unreasonable on its face. Most certainly, consideration by Progressive of how these circumstances affected the value of Gipson's claim falls far short of a showing of outrageous conduct necessary to establish bad faith.

The most significant factor to consider in evaluating Progressive's conduct is whether its actions were "nothing short of a delay tactic" as asserted by Gipson. (Pl.'s Resp. 12); *see Phelps*, 736 F.3d at 708-09. Mere delay is insufficient to sustain a bad faith claim under the KUCSPA. *See id.* at 709. Though Gipson blames Progressive for not settling her 2012 claim until 2016, the record reflects that the delays in her case were far more attributable to her than Progressive.

12

Progressive contacted Gipson within two weeks after the February 2012 accident and continued to initiate regular contact until April when Gipson moved to Florida, which Progressive did not learn about until late July. Communications then resumed through December 2012, when Gipson indicated she was asserting a lost wage claim for which supporting documentation was requested.[5] In January 2013, Gipson's retained counsel told Progressive that he would provide a demand package, but then did not make an initial settlement demand until fourteen month later. In the interim, Progressive's adjuster made numerous attempts to contact Taylor and sent at least twelve written requests for documents supporting the claimed wage loss. (Def.'s Mot. Summ. J. Ex. 4, DN 24-5). Gipson's first settlement demand was finally submitted on March 12, 2014, shortly following Dr. O'Donnell's successful conclusion of his treatment for Gipson late February 2014. (Pl's Resp. 5; Pl.'s Resp. Def.'s Mot. Summ. J. Ex. F, at 12). Gipson's counsel most assuredly cannot be faulted for delaying settlement discussions until his client completed treatment, but by the same token that delay cannot fairly be blamed on Progressive. Instead, most if not all of this delay was due to Gipson or her attorney, or the medical treatment. There is certainly no basis for Gipson's claim that Progressive was responsible for the delay during the first two years following the accident.

After Gipson's first settlement demand in March 2014, Progressive unsuccessfully called Taylor on no less than ten occasions between March and September 2014 to discuss the claim. On September 4, 2014, Dant was able to reach Taylor who advised a state court complaint had been filed in June, but apparently never served on Progressive's insured. (Claim Notes 19-21). From

---

[5] This documentation was apparently never provided. Gipson's discovery responses included claimed damages of $50,000 in past lost wages and $100,000 for future impaired earnings, but this claim ultimately was abandoned by Gipson. (Def.'s Mot. Summ. J. Ex. 7, DN 24-8; Claim Notes 29).

that point forward, the record reflects that the parties engaged in pre-trial discovery and a trial was set initially for December 2015. (Claim Notes 29). The trial was subsequently delayed to July 2016 due to Gipson's need to depose her doctors in Florida, but the parties reached an agreement in April and finalized the settlement in May.[6] (Claim Notes 32, 35). There is no proof in the record that Progressive unduly delayed the state court proceedings and Gipson does nothing to impugn Progressive's efforts in the conduct of that litigation. An insurer does not act in bad faith when it insists that the claimant prove losses, when it refuses settlement for liability which is fairly debatable, or even when settlement fails to provide complete compensation for an injury. *See Wittmer v. Jones*, 864 S.W.2d 885, 892 (Ky. 1993); *Glass*, 996 S.W.2d at 454; *Coomer v. Phelps*, 172 S.W.3d 389, 395 (Ky. 2005).

Gipson criticizes Progressive for not considering in its initial evaluation roughly $9,000 in medical bills she incurred following the 2012 accident. (Pl.'s Resp. 12-13). As Progressive correctly points out, however, liability is abolished under KMVRA for the first $10,000 of basic reparation benefits arising from an automobile accident. *See* KRS 304.39-060(2); *see also Madison v. Nationwide Mut. Ins. Co.*, No. 1:11-CV-157, 2013 U.S. Dist. LEXIS 108685, at *21 (W.D. Ky. Aug. 1, 2013) (recognizing that medical expenses payable out of PIP coverage is

---

[6] Gipson contends without citation to the record that Progressive delayed the settlement for six weeks by insisting that Gipson release Progressive from all claims (presumably including this bad faith claim) as part of the resolution of the personal injury suit against Johnson. (Pl.'s Resp. 10). Progressive filed its $20,000 offer of judgment on April 11, 2016, however, and Gipson's attorney did not raise the release issue until April 25. (Claim Notes 42). The adjuster told defense counsel that Progressive did not typically include itself on the release and the outstanding offer was accepted on April 28. (Claim Notes 42). Subsequently, Gipson's attorney changed firms which contributed over two weeks' delay before the parties executed a release and filed their agreed order of dismissal on May 27. (Claim Notes 43). This final delay, like the others raised by Gipson, was not outrageous and cannot, in any event, be blamed entirely on Progressive.

irrelevant to settlement of a tort claim). Thus, Gipson cannot fault Progressive for excluding these medical bills from its initial settlement offer.

Gipson cites to *Phelps v. State Farm Mutual Automobile Insurance Co.* in support of her argument that summary judgment in not appropriate and that a determination of Progressive's bad faith should be submitted to a jury. The facts of the present case are drastically different from those presented in *Phelps*, where the Sixth Circuit reversed the district court's summary judgment in favor of the insurance company. First, the *Phelps* court cited "general evidence of delay tactics" and "questionable delays" which it felt created triable issues of fact. *See Phelps*, 736 F.3d at 706. The court also believed that there was evidence that the insurer made several "lowball" offers and otherwise refused to consider facts in its claim file which justified increased offers. Additionally, the insurance company drug it feet in disclosing its policy limits where it eventually settled the claim by paying its policy limits. *See id.* at 706-07; *but see id.* at 710 (Batchelder, J., dissenting).

In the present case, there was never any dispute regarding the amount of Progressive's policy coverage. This clearly is not a situation where an insurer could be accused of jerking a claimant around, necessitating the filing of a lawsuit, and then paying its policy limits where that result could have been achieved early on. Instead, as discussed above, Gipson did not complete medical treatment and make her initial settlement demand until over two years after the accident, and that demand was more than double Progressive's limit of coverage.

The parties ultimately settled Gipson's claim for $20,000, an amount less than one-tenth of Gipson's initial demand. Gipson's last demand before filing suit was $120,000—still not within Progressive's policy limits. It is not bad faith for an insurer "to refuse a demand to settle for a sum in excess of the policy limits . . . ." *Glass*, 996 S.W.2d at 454 (citation omitted). Even when Gipson lowered her demand to $100,000, "it is not bad faith *per se* for a liability insurer to offer

15

to settle for less than its policy limits." *Id.* at 453. This is especially true in a case like Gipson's, "where . . . the claimants *never demanded payment of the policy limits or any other sum* prior to retaining an attorney." *Id.* (citation omitted). In fact, Gipson did not demand *any* sum until more two years after the collision and over a year after she hired counsel and she did not demand payment within policy limits for an additional year into the litigation. Progressive eventually increased its offer to $20,000 based upon anticipated litigation expenses and following testimony from Dr. O'Donnell linking Gipson's back pain and treatment to the subject accident, and Gipson eventually accepted this offer. (Claim Notes 40; Def.'s Mot. Summ. J. Ex. M, DN 24-13; Pl.'s Resp. 9). Nothing in this chronology supports claims of general delay tactics by Progressive. Progressive rightly points out that under Kentucky law, "settlements are not evidence of legal liability, nor do they qualify as admissions of fault." *Hollaway*, 497 S.W.3d at 738.

Perhaps in any litigated dispute, fault can be directed at an opposing party for failure to respond quickly enough to information produced through discovery and to revise its evaluation of a case. In such situations where an insurance company operates under the mandates of the UCSPA, second-guessing adjusters' handling of claims would be commonplace without the heightened standard Kentucky courts have demanded for bad faith claims. In the present case, Gipson has failed to submit evidence indicating that Progressive abused its superior economic might or otherwise intentionally engaged in outrageous conduct in its handling of Gipson's claim. The evidence in this case is insufficient to justify submission of Gipson's bad faith claim to a jury. For these reasons, Progressive's motion for summary judgment is granted.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (DN 24) is **GRANTED**, and the Complaint is **DISMISSED WITH PREJUDICE**.

Greg N. Stivers, Chief Judge
United States District Court

March 20, 2019

cc: counsel of record